GUILFORD ASSOCIATION, INC. *v.* J. CHARLES
BEASLEY ET UX.

[No. 436, September Term, 1975.]

*Decided January 6, 1976.*

The cause was argued before POWERS, GILBERT and MENCHINE, JJ.

*Robert C. Prem,* with whom were *Niles, Barton & Wilmer* on the brief, for appellant.

No appearance by appellee.

GILBERT, J., delivered the opinion of the Court.

Guilford Association, Inc., (Guilford), appellant, asks us to reverse an Order of the Circuit Court of Baltimore City, dismissing a Bill of Complaint in which Guilford sought declaratory relief and an injunction against J. Charles Beasley and Frances J. Beasley, his wife (Beasley).

The factual genesis of this case is simple. Guilford is the assignee of The Roland Park Company and, as such, may enforce the restrictive covenants and conditions embodied in an agreement dated June 26, 1913 and recorded among the Land Records of Baltimore City. Basically the restrictions are designed to preserve the residential character of Guilford.[1] The agreement, by its terms, would have expired on January 1, 1950, but it contained a proviso that if not less than two-thirds of the property owners in Guilford consented to an extension, the agreement would then continue " . . . for a period of twenty (20) years from that date [January 1, 1950] and thereafter for successive periods of twenty (20) years. . . ." Two-thirds of the owners have twice voluntarily extended the life of the agreement, so that the expiration date, absent further extensions, is January 1, 1990.

Beasley acquired the property known as 3809 Greenway on January 16, 1964. The Beasley residence is within the geographical confines of Guilford, and is subject to the restrictions in the extended agreement. The evidence shows that Beasley parks or stores five or more motor vehicles

---

1. The Court of Appeals in Grubb v. Guilford Ass'n , 228 Md. 135, 178 A. 2d 886 (1962) upheld the residential purposes restriction and refused to allow a doctor to maintain an office practice in his Guilford home.

upon his driveway. Guilford alleged that the vehicles were stored on the premises and pointed out, in support of that assertion, that the cars were without license plates for a stated period of time. Beasley testified that prior to trial, apparently in response to a housing violation notice from the appropriate Baltimore City agency, he had placed "tags" on all of the cars and that they were operable. Beasley denied "storing" vehicles, and testified that they were for the personal use of himself and his family. He characterized the vehicles as "special interest" cars.[2]

Guilford alleged in the circuit court, and argues here, that the motor cars were stored and that "storing" of the vehicles constitutes a violation of Sub-Division III of the 1913 agreement, as extended. That section provides:

> *"The land included in said tract, except as hereinafter provided, shall be used for private residence purposes only* and no building of any kind whatsoever shall be erected or maintained thereon except private dwelling-houses, each dwelling being designed for occupation by a single family, and private garages for the sole use of the respective owners or occupants of the plots upon which such garages are erected." (Emphasis supplied).

The Chancellor, in his "Memorandum Opinion and Order", construing the above quoted restrictive covenant as applied to the facts of this case, said:

> "In reviewing the first paragraph of Sub-Division III, the Court finds no language which can reasonably be construed to prevent an owner or occupant of a home located in Guilford from parking over a given number of autcmobiles in his driveway. The number of photographs admitted into evidence makes it difficult to dispute the fact that six (6) cars, some without license, have been

---

2. Beasley defined a "special interest" car as one which is no longer made and will appreciate in value. Included in the group were two Corvairs and a 1967 Lincoln Continental Convertible.

parked on the Beasley premises for an extended period of time. *It is also clear, notwithstanding Defendants' claim to the contrary, that most of the vehicles are not used on a regular basis, if at all, by the Defendants or their family.* However, as obnoxious as this condition might be, it is not, in the Court's opinion, in violation of the provision relied upon by the Plaintiff. The provision in question is directed at the *kind* and *use* of *buildings* which can be *erected* and *maintained* on the land. It prohibits all buildings except private dwelling-houses designated for occupancy by a single family and private garages for the sole use of the owners or occupants. There is neither allegation nor evidence that the Beasleys have violated any of these building prohibitions. There is no contention that the automobiles are not the property of Defendants, and kept for their private purposes. Rather, the Plaintiff seems to be attempting to apply this provision restricting the erection and maintenance of buildings to a situation involving parked cars on the property in question. It argues that the language the '. . . land . . . shall be used for private residence purposes only. . .' should be construed to mean that the Defendants' vehicles must be used with some frequency or be deemed stored or otherwise in violation of Sub-Division III.

The Court finds no foundation in Sub-Division III for this conclusion. Even if there were reasonable grounds for Plaintiff's rationale, the Court would have to use its judgment as to how many parked vehicles constitute a . . . violation, and how long they could remain unused before becoming violative of an unspecified standard."

Guilford avers that the covenant proscribes the parking of an excessive number of motor vehicles upon the Beasley property. Guilford reads the quoted clause to mean that unless Beasley's vehicles are "used with some frequency"

they should "be deemed stored or otherwise in violation of Sub-Division III."

To underpin its position, Guilford cites *Incorporated Village v. Green*, 166 N.Y.S.2d 219, 8 Misc. 2d 356 (1957). In that case Justice Christ of the New York Supreme Court was called upon to decide whether an automobile agency was parking cars, a permitted use, or storing them for the purpose of display and sale, a non-permitted use. He wrote:

> " . . . When automobiles are left for months on end at a given place, there can be no doubt that they are stored and not parked. Parking is of short duration and measured by hours or at most by a day or two. It has in it the element of an automobile in use, being temporarily placed until it is about to be again put into service and use. The cars which have been upon the lot and about which the complaint is concerned are not cars ready for the road. They are not licensed for the road, they are not cleaned, greased and oiled for the road nor are they equipped for the road. The use of the lot for these cars is not parking but storage, storage awaiting the time when they will be withdrawn for sale and delivery. 'There is a substantial distinction, clearly cognizable, between the meaning of "storage" and "parking". One has a certain degree of permanency, while the other . . . [connotes] transience.' *Monument Garage Corp. v. Levy*, 266 N. Y. 339, . . . 343[-44], 194 N. E. 848, . . . 850 [(1935)]." 166 N.Y.S.2d at 221-22.

Green endeavored to place himself outside the scope of the ordinance by asserting that all he was doing was "parking" cars even though he was selling them from the lot where they were kept. The lot was in close proximity to Green's Ford agency. The cars were not licensed for the road, nor were they immediately available for use. Here, the cars, according to Beasley, were kept clean and ready for use. He said he used them " . . . at least every thirty days. It might run forty-five days. They are not used every day, but they

are used. They [his family] are able to take the key right now, crank them up and drive them out." Guilford's evidence indicated that for about a two week period the vehicles were on the property *sans* license plates at 8:30 each morning. Beasley testified that because he is an automobile dealer, he had used dealer tags on them, but after the housing violation notice, he acquired regular license plates. The use of "dealer tags" on the vehicles would seem to indicate that they were being offered for sale, but we do not here decide that issue, nor do we pass upon the propriety, *vel non,* of the use of dealer tags for private purposes.

The general rule with respect to the interpretation of restrictive covenants in deeds is that they will be construed more strictly against the grantors or those seeking to enforce them. All doubts are to be resolved in favor of those resisting enforcement of the covenants. J. Best, *The Law Governing Restrictions and Restrictive Covenants* 92 (1934). *See also Bartell v. Senger,* 160 Md. 685, 693, 155 A. 174, 177-78 (1931); *Meredith v. Danzer,* 142 Md. 573, 583, 121 A. 245, 248 (1923). When the words of the restrictive covenant sought to be enforced are logically susceptible of a construction which would not violate the covenant, as against a construction which would violate it, courts will place a construction upon the words that will result in no violation. J. Best, *The Law of Restrictions and Restrictive Covenants* 91 (1934). *See also Himmel v. Hendler,* 161 Md. 181, 155 A. 316 (1931); *Bartell v. Senger, supra.*

If the clarity of the restrictive covenant is dubious, the courts will hold the restriction to its narrowest limits. Put another way, if there is doubt as to the meaning of the restriction, the courts will generally rule in favor of the freedom of the property from the strictures of the restriction. *Himmel v. Hendler, supra; Peabody Heights Co. v. Willson,* 82 Md. 186, 203, 32 A. 386, 389 (1895).

Guilford takes the tack that "[t]he original parties to the Guilford Deed and Agreement could not have intended by Sub-Division III to restrict the buildings to private dwelling houses and private garages, and meanwhile to leave the surrounding land unencumbered and available for any form

of commercial exploitation short of building." We agree. As we read the covenant it is clear that all the *land* in the Guilford tract was placed under the restriction, that it is to be used " . . . for private residence purposes only. . . ." The construction placed upon the quoted clause by the Chancellor leaves room, disregarding local zoning regulations, for the opening of a neighborhood vegetable and fruit stand, most certainly intended by the restrictive covenant to be proscribed within the Guilford geographical confines.

The courts, it would seem, are under a duty to effectuate rather than defeat an intention which is clear from the context, the objective sought to be accomplished by the restriction and from the result that would arise from a different construction. *Sowers v. Holy Nativity Church*, 149 Md. 434, 441, 131 A. 785, 787-88 (1926). Furthermore, courts in construing restrictive covenants must consider the circumstances surrounding the parties at the time the covenant was made and the fact that the restrictions were not imposed solely for the benefit of the grantor, " . . . but mainly for that of the grantee and those similarly situated with him. . . ." *Wehr v. Roland Park Co.*, 143 Md. 384, 392, 122 A. 363, 366 (1923). The restrictions in the case now before us were not imposed for the benefit of The Roland Park Company nor its assignee, the appellant. We believe it beyond serious question but that the restrictions on the Guilford tract are for the benefit of the residents of Guilford in that the restrictions protect their property value, maintain the *status quo* with respect to the neighborhood esthetics and generally aid in making the area a better place in which to reside.

We hold the meaning of the words, "The land included in this tract . . . shall be used for private residence purposes only . . . ." to mean that the *land* is to be used for private residence purposes and no other purpose. It logically follows that all buildings erected upon the land are restricted to the same residential use.

We reverse the order dismissing Guilford's Bill of Complaint. We observe, however, that in the light of the

construction placed upon the subject restrictive clause, the Chancellor did not reach the question of whether Beasley's conduct actually amounted to a breach of the restrictive covenant. We, therefore, remand the matter to the circuit court for further proceedings in order that it might determine if Beasley has violated the restriction thus requiring the issuance of the sought injunction.

> *Order dismissing bill of complaint reversed.*
> *Case remanded for further proceedings.*
> *Costs to be paid by appellees.*