903 A.2d 938

**Eric MILLER**

v.

**BAY CITY PROPERTY OWNERS ASSOCIATION, INC.**

**No. 131 Sept. Term, 2005.**

Court of Appeals of Maryland.

July 31, 2006.

622

J. Donald Braden (Foster, Braden & Thompson, L.L.P., Stevensville, MD), on brief, for Petitioner.

Stephen Z. Meehan (Joseph B. Tetrault of Funk & Bolton, P.A., Chestertown, MD), on brief, for Respondent.

Argued before BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

This case concerns the creation of covenants of reservation in real property schemes of development. Eric Miller, petitioner, purchased a tract of land from Bay City Property Owners Association, Inc. ("BCPOA"), respondent. Petitioner filed suit in the Circuit Court for Queen Anne's County after being denied permission to build a residence on the purchased lot because the tract of land was alleged by BCPOA to be restricted to use as a "Community Boat Harbor Reservation." The Circuit Court granted petitioner's motion for summary judgment, finding that respondent failed to comply with the requirement that a plat reflecting the boat harbor reservation be recorded in order for the reservation to become effective. Respondent filed a timely appeal with the Court of Special Appeals. That court, in an unreported opinion, determined that respondent's recording of a declaration designating the lot in question as a boat harbor reservation was sufficient to comply with the requirement that a plat be recorded. Petitioner filed a petition for writ of certiorari on December 20, 2005; we granted certiorari on March 9, 2006. *Miller v. Bay City Prop. Owners Ass'n*, 391 Md. 577, 894 A.2d 545 (2006).

Petitioner presented the following question for our review: "Did the Court of Special Appeals have a legal basis to reverse the Circuit Court for Queen Anne's County?" The answer to this question requires us to determine whether a statement in a recorded declaration is sufficient to enforce a covenant creating the right to designate a reservation but specifically requiring the filing of a plat showing that the lot in question was designated as a boat harbor reservation. Under the

circumstances here present, we hold that respondent's failure to file a plat, as specifically required, prevents it from enforcing the alleged restrictive covenant as to the Lot at issue in the case at bar.

## I. Facts

On June 9, 1952, the deed for the development in which the property in question is located was recorded in the Land Records of Queen Anne's County. The land was to be developed as a residential community including "dwelling houses, a retail commercial area, non-commercial structures, including churches, recreational facilities and structures, and such other buildings as are customary in such communities . . . ." In the deed, the developers determined that

> "it is considered impractical, at this time, or at any one time, to develop or lay out all of the said tract, or to fix, for all parts thereof, the particular residential dwelling, retail commercial area, or non-commercial uses . . .; but a general outline plat of the total acreage included within the whole of said development has been prepared by the said Corporation, which shows the area reserved for residential or dwelling uses, and other areas *tentatively* reserved for residential, dwelling and retail commercial uses and non-commercial and recreational uses, including *tentative* Beach Reservations, without particularizing or specifying as to the exact locations for the establishment of said additional Beach Reservations, or of the retail commercial, non-commercial and recreational uses which are to be made in the lands therein contained; and said 'GENERAL OUTLINE PLAT' is recorded or intended to be recorded among said Land Records of Queen Anne's County, simultaneously with the recording of this Deed and Agreement . . . ." [Emphasis added.]

The plat filed with the deed presented a tentative layout of the tract of land.

Although most of the layout on the plat was tentative, the deed specifically provided that some of the lots would have a fixed purpose:

"WHEREAS, the said Corporation expressly reserves unto itself, and its successors, the right to change the *Tentative* Layout of the sections, blocks, and reservations, as to the ground plan lay-out, and as to residential and dwelling areas, and as to recreational and non-commercial uses, now shown on said general outline plat (other than Blocks One to Twenty, inclusive, in Section One, as shown on said Outline Plat, and the location of the 'Community Bathing Beach', which said section, blocks, locations and facilities are hereby fixed and shall now be considered to be irrevocable and unchangeable), as, from time to time, the said Corporation shall determine for each succeeding section (which need not be developed or recorded in numerical order) the final determination of such plans and uses as to each section, to be evidenced by the recording of the Plat for the same among the Land Records of Queen Anne's County." [Emphasis added.]

In addition to the lots evidently designated for a "Community Bathing Beach," the deed contained a number of covenants that established the process to be used for future designations and restrictions on the use of the lots. One of those covenants stated:

### *"COMMUNITY BOAT HARBOR RESERVATION"*

"(7) The Corporation, for itself and its successors in the ownership or development of the land contained in said Community, desires and expects, and therefore reserves the right, in the future, to select, fix and determine the location, upon the waters of Board [sic] Creek, of *a* parcel of land, to be known and designated as *a* 'Community Boat Harbor Reservation' and to show and designate the location of said 'Community Boat Harbor Reservation', *upon a plat thereof,* to be hereafter filed for record among the Land Records of Queen Anne's County".[1]

---

1. This reservation was for a single "Community Boat Harbor" not multiple boat harbors.

"(8) *Upon the date of the recording of said plat,* upon which is designated the location of said 'Community Boat Harbor Reservation' such 'Community Boat Harbor Reservation' shall, from thenceforth be expressly and irrevocably reserved, dedicated and restricted to use in common by the bona fide members of the Association, which shall be formed, as hereinbefore and hereinafter indicated, for the harboring of boats, of such boating and recreational projects and activities as may be conducted, ~~and the conducted,~~ sponsored or promoted by said Association." [Emphasis added.]

The original deed, therefore, provided specifically how the "Community Boat Harbor Reservation" was to be created and that there was only to be one. The only plat filed after the original tentative plat, is dated October 17, 1958, and does not designate any lot or lots as a "Community Boat Harbor Reservation."

On April 7, 1963, the lot in question in this appeal was transferred, with a number of other tracts, to the Bay City Improvement Association, Inc. ("BCIA"), later to become BCPOA. Eleven years later, on December 16, 1975, BCIA recorded a "Declaration," which stated:

"Explanatory Statement"

"By Deed and Agreement dated May 29, 1952, and recorded among the Land Records of Queen Anne's County, ... The Bridgeside Company established certain 'covenants, restrictions, reservations, dedications, conditions, agreements and understandings' with respect to a subdivision known as 'Bay City' ....

"Paragraphs (7) and (8) of the Deed and Agreement of May 29, 1952, refer to a 'Community Boat Harbor Reservation' to be established by The Bridgeside Corporation, or its successors in the ownership or development of the land in Bay City.... Bay City Improvement Association, Inc. was assigned certain rights and privileges with respect to the provisions of the aforesaid Deed and Agreement of May 29, 1952.

"By Deed recorded among the Land Records ..., Bay City Improvement Association is the owner, in fee simple, of Lots 11 and 12, Block 24, and Lot 27, Block 32, as shown on a plat entitled 'Plat 2, Section 2, Bay City', ... dated October 17, 1958 ....

"At a meeting of the Board of Directors of Bay City Improvement Association and at a meeting of the members held on September 7, 1975, the Corporation authorized and directed that the lots designated in the preceding paragraph be designated as 'Community Boat Harbor Reservation' as referred to in the Deed and Agreement of May 29, 1952.

\* \* \*

"Bay City Improvement Association, Inc., does further declare that:

"1. The portion of the aforesaid Plat of October 17.1958, which shows the lots designated above is hereby adopted as the plat which shows and designates the location of said 'Community Boat Harbor Reservation' as referred to in Paragraph (7) of the Deed and Agreement of May 29, 1952.

"2. From the date hereof, the lots referred to herein shall be expressly and irrevocably reserved, dedicated and restricted to use in common by the bona fide members of Bay City Improvement Association, Inc., for the harboring of boats or such boating and recreational projects and activities as may be conducted, sponsored or promoted by the Association subject only to reasonable regulations and charges with respect to such use as may be made by the Association."

The declaration was recorded in the Land Records of Queen Anne's County; however, a plat designating the "Community Boat Harbor Reservation" was never filed as required by the original reservation of the right to designate. Moreover, Lots 11 and 12 in Block 24, although contiguous with each other, are far removed and on the opposite side of Broad Creek from Lot 27 in Block 32 and not even opposite of that lot across

Broad Creek. Accordingly, they cannot reasonably be construed as a single harbor. It is beyond dispute that the respondent is attempting to create multiple boat harbors where, even if it had done so properly, the reservation it was attempting to exercise only conferred upon it the right to create a single boat harbor.[2]

On September 25, 2000, petitioner wrote a letter to respondent in which he stated:

"I am [an] avid fisherman/boater and would thoroughly enjoy having private access to the water within close proximity to my existing residence in Bay City. ·

"This is the reason I am willing to offer a reasonable price of $25,000.00 for your lot. I also understand that on top of the $25k for the lot, I will also takeover the payments on the sewer assessment on said lot of approximately 15K, for a total investment of $40k.

"Thank you for consideration in this matter and also please note that I am in the position to offer a quick cash settlement."

Two months later, on November 30, 2000, petitioner and respondent entered into a standard sales agreement. On December 7, 2000, Lot 27, Block 32, was conveyed to petitioner in fee simple under a special warranty deed. This deed made no express reservations as to "Community Boat Harbor" use.

After the transfer, petitioner decided to pursue building a residential dwelling on the property. On March 16, 2001,

---

2.· The Circuit Court pointed to the following facts in its memorandum:

 a. "In the 1975 *Declaration*, [respondent] attempts to establish two Boat Harbors–Lots 11 and 12 in one block and Lot 27 of another block, yet, the language in the 1952 Deed clearly envisions only a single Boat Harbor."

 b. "In practice, [respondent] only established and used Lots 11 and 12 as the Community Boat Harbor."

From a review of the reservation itself and the plat which shows the location of the lots there cannot be a genuine dispute as to these facts. We agree with the trial judge ( a copy of the plat showing the location of the respective parcels is attached).

respondent provided the following response to one of petitioner's requests: "Bay City Property Owners Association, after careful review of the proposed building plans submitted by Eric Miller, would be willing to reduce the front line set-backs from Irene Way from 35 feet to 25 feet." Notwithstanding this letter, the chairman of the association's Architectural and Permit Committee stated that "no formal application for building permit was received from Mr. Miller for 407 Irene Way (Lot 27, Block 32) until April 25, 2003."

Respondent's subsequent denial of petitioner's application for a building permit because the lot was mentioned in the declaration aforesaid as a "Community Boat Harbor Reservation" gave rise to the case at bar. Petitioner filed a complaint in the Circuit Court for Queen Anne's County asking the court for a declaratory judgment stating that the filing of a plat designating Lot 27 as a "Community Boat Harbor Reservation" was a condition precedent to the enforcement of the restrictive covenant prohibiting petitioner from building a residence on that lot. The complaint also alleged: breach of the sales contract, breach of warranty with respect to the special warranty deed, and unfair and deceptive practices. Both petitioner and respondent filed motions for summary judgment stating that there was no genuine dispute of material facts. Petitioner asked the court to determine that, as a matter of law, respondent was required to file a plat designating the lot as a community boat harbor and that failure to file such plat prior to the conveyance of the *lot* to petitioner prevented BCPOA from denying petitioner's application for building on the lot. Respondent argued that the recorded declaration satisfied the plat recording requirement of the 1952 deed.

The Circuit Court, in its memorandum opinion, determined that: "It is a basic tenet of property law that restrictions are in derogation of free conveyance, are not favored, and will be construed strictly against the enforcing party." (citing *Balt. Butchers Abattoir & Live Stock Co. v. Union Rendering Co.,* 179 Md. 117, 17 A.2d 130 (1941)). As a result, failure to record a plat alone, as expressly required by the 1952 deed,

voided respondent's attempt to establish a "Community Boat Harbor Reservation" on Lot 27. Nevertheless, the Circuit Court went on to explain that, in addition to the failure to record the plat and the limitation to a single boat harbor reservation, respondent's actions with respect to the sale of Lot 27 were inconsistent with its argument that the lot was considered a Community Boat Harbor Reservation. The Circuit Court then granted summary judgment in favor of petitioner.

The Court of Special Appeals took a different approach and arrived at the opposite conclusion. The intermediate appellate court acknowledged that " '[c]ovenants creating restrictions are to be construed strictly in favor of the freedom of the land, and against the person in whose favor they are made[.]' " (quoting *McKenrick v. Savings Bank of Balt.*, 174 Md. 118, 128, 197 A. 580, 584 (1938)). It determined, however, that the language defining the restrictive covenant was to be interpreted in light of the familiar rules of contract construction. The court pointed to *Maryland Coal Co. v. Cumberland and Pennsylvania Railroad*, 41 Md. 343, 352 (1875), for the standard to be used in evaluating the covenant:

> "[I]t is the duty of courts to ascertain, if possible, the intention of the parties, as manifested by the terms of the instrument. If the intention of the parties is plainly manifest upon the face of the instrument there is no room for interpretation, and there is nothing left for the courts but to carry into effect the intention of the parties so ascertained, unless prevented from doing so by public policy or some established principle of law. The rule is well settled that, in ascertaining the meaning of words in a deed or other written instrument, technical words must be given their technical meaning and signification."

*Id.* at 352. The Court of Special Appeals held that the intent of the parties in stating that the plat designating the lots as a "Community Boat Harbor Reservation," was to provide notice to future purchasers that the lots so designated were burdened by the stated condition. As a result, the filing of the 1975 declaration, which adopted the original plat and designat-

ed the lots as a "Community Boat Harbor Reservation," according to that court was sufficient to comply with the requirement of the 1952 deed. The intermediate appellate court also found that the Circuit Court's reliance upon BCPOA's actions regarding the sale were immaterial and, furthermore, their consideration would result in a genuine dispute of material facts, which made the grant of summary judgment in favor of the petitioner inappropriate.

## II. Standard of Review

"Maryland Rule 2–501 indicates that a motion for summary judgment is appropriate 'on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law.' A motion for summary judgment may be supported by affidavit. When reviewing the grant or denial of a motion for summary judgment we must determine whether a material factual issue exists, and all inferences are resolved against the moving party." *King v. Bankerd,* 303 Md. 98, 110–111, 492 A.2d 608, 614 (1985) (citing *Lynx, Inc. v. Ordnance Products, Inc.,* 273 Md. 1, 7–8, 327 A.2d 502, 509 (1974)). " '[E]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact.' " *King v. Bankerd,* 303 Md. at 111, 492 A.2d at 614 (quoting *Porter v. General Boiler Casing Co.,* 284 Md. 402, 413, 396 A.2d 1090, 1096 (1979) (citations omitted)). The function of a summary judgment proceeding is not to try the case or to attempt to resolve factual disputes but to determine whether there is a dispute as to material facts sufficient to provide an issue to be tried. *Honaker v. W.C. & A.N. Miller Development Co.,* 285 Md. 216, 231, 401 A.2d 1013, 1020 (1979) (citing *Dietz v. Moore,* 277 Md. 1, 4–5, 351 A.2d 428 (1976)). A 'material fact' is one which will somehow affect the outcome of the case. *Id.* (citation omitted).

"An appellate court reviewing a summary judgment examines the same information from the record and determines the same issues of law as the trial court. *Paine-Webber Inc. v. East*, 363 Md. 408, 413, 768 A.2d 1029, 1032 (2001) (citation omitted). We are often concerned with whether a dispute of material fact exists when reviewing the grant of a summary judgment motion. *Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206, 209 (2001) (citing *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 144, 642 A.2d 219, 224 (1994)). We recently reiterated the standard of review for a trial court's grant or denial of a motion for summary judgment in *Myers v. Kayhoe*, 391 Md. 188, 892 A.2d 520 (2006):

> 'The question of whether a trial court's grant of summary judgment was proper is a question of law subject to *de novo* review on appeal. *Livesay v. Baltimore*, 384 Md. 1, 9, 862 A.2d 33, 38 (2004). In reviewing a grant of summary judgment under Md. Rule 2–501, we independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Id.* at 9–10, 862 A.2d at 38. We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party. *Id.* at 10, 862 A.2d at 38.'

*Id.* at 203, 892 A.2d at 529."

*United Serv. Auto. Ass'n v. Riley*, 393 Md. 55, 67, 899 A.2d 819, 826 (2006).[3]

## III. Discussion

Restrictive covenants have a long history. *Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374, 897 A.2d 206 (2006); *Kobrine v. Metzger*, 380 Md. 620, 846 A.2d 403 (2004); *Roper v. Camuso*, 376 Md. 240, 829 A.2d 589 (2003); *Stansbury v.*

---

3. We note that both parties argued at the trial level that there were no disputes of material facts.

*Jones,* 372 Md. 172, 812 A.2d 312 (2002); *Colandrea v. Wilde Lake Comty. Ass'n,* 361 Md. 371, 761 A.2d 899 (2000); *Steuart Transp. Co. v. Ashe,* 269 Md. 74, 304 A.2d 788 (1973); *Md. Coal Co. v. Cumberland and P.R.,* 41 Md. 343 (1875); *Thruston v. Minke,* 32 Md. 487 (1870). Early on, the Court recognized as settled law

> "that a grantor may impose a restriction, in the nature of a servitude or easement, upon the land that he sells or leases, for the benefit of the land he still retains; and if that servitude is imposed upon the heirs and assigns of the grantee, and in favor of the heirs and assigns of the grantor, it may be enforced by the assignee of the grantor against the assignee (with notice) of the grantee."

*Halle v. Newbold,* 69 Md. 265, 270–71, 14 A. 662, 663 (1888). Such restrictions were deemed to be enforceable whether or not they ran with the land, as stated in *Newbold v. Peabody Heights Co. of Balt.,* 70 Md. 493, 17 A. 372 (1889):

> "[T]he general principle of equity ... that a restrictive covenant entered into between a vendor and vendee, or lessor and lessee, in respect to the manner of using the property, would be enforced by a court of equity, as against the vendee or lessee, and his assigns, without respect to the question as to whether the covenant did or did not, in a legal sense, run with the land."

*Id.* at 500–01, 17 A. at 374.

Even in the 1800's, however, restrictive covenants had limits, as Chief Judge Robinson explained:

> "[A]lthough one in conveying real estate may impose certain restrictions upon its use, provided they do not deprive the owner of the beneficial use of the property, yet at the same time, Courts will always favor a liberal interpretation of the language of such restrictions, in order to impose as few difficulties as possible in the free use and disposal of the particular estate conveyed. And it may be said that if the words are doubtful, they will be resolved in favor of keeping the restriction within the narrowest limits. In other words,

if there be doubt as to the intention of the parties, Courts will naturally lean in favor of the freedom of the property." *Peabody Heights Co. of Balt. v. Willson,* 82 Md. 186, 203, 32 A. 386, 389 (1895), *aff'd on reh'g,* 82 Md. 186, 32 A. 1077 (1895).

The construction of restrictive covenants has evolved over the years from a principle of strict construction to one of reasonably strict construction. In *Baltimore Butchers Abattoir & Live Stock Co.,* the Court explained:

"It is also a fundamental rule that, since restrictions are in derogation of conveyances and repugnant to trade and commerce, restrictive covenants are not favored by the courts, but should be strictly construed against the parties seeking to enforce them. A restrictive covenant should not be extended by implication beyond its original intent to include anything not clearly expressed in the conveyance, and, if there is ambiguity in its meaning, any doubt should be resolved in favor of the unrestricted use of the property, if it reasonably can be done. The burden rests upon the party relying on a restrictive covenant to bring himself within its terms."

179 Md. at 123, 17 A.2d at 133. The strict construction rule is under some circumstances, modified however, as Judge McAuliffe explained:

"If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement. *Martin v. Weinberg,* 205 Md. 519, 526, 109 A.2d 576 (1954); *Himmel v. Hendler,* 161 Md. 181, 187, 155 A. 316 (1931); *Guilford Ass'n Inc. v. Beasley,* 29 Md.App. 694, 699, 350 A.2d 169, *cert. denied,* 277 Md. 735 (1976). The rule of strict construction should not be employed, however, to defeat a restrictive covenant that is clear on its face, or is clear when considered in light of the surrounding circumstances.

The courts seem to have generally recognized that there is no public policy against a fair and reasonable construc-

tion, in the light of surrounding circumstances, of restrictions designed, in general, to accomplish the same beneficial purposes as zoning.

*Martin v. Weinberg, supra,* 205 Md. at 527, 109 A.2d 576. The courts, it would seem, are under a duty to effectuate rather than defeat an intention which is clear from the context, the objective sought to be accomplished by the restriction and from the result that would arise from a different construction.

*Guilford Ass'n Inc. v. Beasley, supra,* 29 Md.App. at 700, 350 A.2d 169. *See also Lake Barrington Shore Homeowners v. May,* 196 Ill.App.3d 280, 143 Ill.Dec. 107, 109, 553 N.E.2d 814, 816 (1990) (rule of strict construction in favor of free use of property not applied to defeat obvious purpose of restriction, even if not precisely expressed)."

*Belleview Constr. Co. v. Rugby Hall Comty. Ass'n,* 321 Md. 152, 158, 582 A.2d 493, 495–96 (1990). In the case at bar, however, the condition precedent is clear and the position taken by respondent that the Declaration created two boat harbors-while the reservation only permitted one is unclear.

In *County Commissioners v. St. Charles Associates Limited Partnership,* 366 Md. 426, 784 A.2d 545 (2001), we stated:

"Prior to 1955, when construing the meaning of covenants a strict construction standard was applicable to promote the free alienability of land. *See Turner v. Brocato,* 206 Md. 336, 345–46, 111 A.2d 855, 860 (1955). This being so, the principle 'that doubt must be resolved in favor of the alienability of land,' free and unfettered, was modified and does not always control; '[t]his rule of construction bows always to the more fundamental rule that wherever possible effect will be given to an ascertained intention of the parties.' *Turner,* 206 Md. at 352, 111 A.2d at 864. In *Gnau v. Kinlein,* 217 Md. 43, 48, 141 A.2d 492, 495 (1958), we addressed restrictive covenants when we stated:

'Whether a restrictive covenant is personal to a grantee or a grantor, or to both, or binds their respective successors in title, and so the land by whomever owned from

time to time, as well as whether a grantor intended to bind land retained by him, is a question of intention, which may be ascertained from the language of the conveyances alone or from that language together with other evidence of intent.'

\* \* \*

" '. . . [I]n more recent years, a "reasonableness rule" (termed a modern rule in some foreign jurisdictions) has been engrafted upon the general rule.' " *Markey [v. Wolf]*, 92 Md.App. [137,] 150, 607 A.2d [82,] 88 [ (1992) ]. Currently, Maryland courts no longer apply a pure strict interpretation or construction, but apply rather, a reasonably strict construction when construing covenants. In *Markey*, the Court of Special Appeals, interpreting the position of this Court, adhered to the reasonableness rule when it considered the restrictive covenant at issue in that case. That court stated:

'In interpreting words used to create restrictions, *the court should endeavor to ascertain the real purpose and intention of the parties and to discover the purpose from the surrounding circumstances at the time of the creation of the restriction*, as well as from the words used. In endeavoring to arrive at the intention, the words used should be taken in their ordinary and popular sense, unless it plainly appears from the context that the parties intended to use them in a different sense, *or that they have acquired a peculiar or special meaning in respect to the particular subject-matter.*'

*Id.* at 153, 607 A.2d at 90."

*County Comm'rs*, 366 Md. at 445–48, 784 A.2d at 556–558 (footnote omitted). Consequently, in the present case, the restrictive covenant, which is expressly written into the 1952 deed, must be interpreted to effectuate the intent of the parties at the time the deed was created if that intent is clear. If not, the strict construction rule still prevails.

 In determining the intent of the parties we must begin with the actual language used in the deed: "If the intention of the parties is plainly manifest upon the face of the instrument there is no room for interpretation, and there is nothing left for the courts but to carry into effect the intention of the parties so ascertained, unless prevented from doing so by public policy or some established principle of law." *Md. Coal Co.*, 41 Md. at 352. In the case *sub judice*, the deed specifically provides:

"(7) The Corporation, for itself and its successors in the ownership or development of the land contained in said Community, desires and expects, and therefore reserves the right, in the future, to select, fix and determine the location, upon the waters of Board [sic] Creek, of *a* parcel of land, to be known and designated as a 'Community Boat Harbor Reservation' and *to show and designate* the location of said 'Community Boat Harbor Reservation', *upon a plat* thereof, to be hereafter *filed for record* among the Land Records of Queen Anne's County.

"(8) *Upon the date of the recording of said plat*, upon which is designated the location of said 'Community Boat Harbor Reservation' such 'Community Boat Harbor Reservation' shall, from thence forth be expressly and irrevocably reserved, dedicated and restricted to use in common by the bona fide members of the Association, which shall be formed, as hereinbefore and hereinafter indicated, for the harboring of boats, of such boating and recreational projects and activities as may be conducted, ~~and the conducted,~~ sponsored or promoted by said Association." [Emphasis added].[4]

The words used are clear and unambiguous. First, there was to be a single boat harbor. Second, the designation was to be made upon a plat. Third, the designation did not become

---

4. This language referring to *a* boat harbor is contrasted with the plural language in reference to "beach reservations." The developer clearly knew how to use language creating reservations for plural amenities. He (or it) chose not to do so in reference to boat harbors.

effective until the date the plat was recorded. Had the grantor wanted a less onerous restriction, it could have simply stated that the designation was to be determined at a later time without imposing a plat recording requirement.

It is also useful to look at the language used in the other sections of the 1952 deed, in order to ascertain the original intent. The 1952 deed initially provides for the process by which all designations will be made:

> "[T]he said Corporation expressly reserves ... the right to change the Tentative Layout ... as, from time to time, the said Corporation shall determine ... the final determination of such plans and uses as to each section, *to be evidenced by the recording of the Plat* for the same among the Land Records of Queen Anne's County." [Emphasis added].

In addition to the general designation clause, the deed contains a total of four other clauses regarding the designation of the lots in the development for particular purposes: beach reservations, community bathing reservation, community boat harbor reservation, and retail commercial area. Each one of these clauses required that a designation be made on the plat and stated that such designation would become effective upon the recording of that plat. Requiring that all designations be made on a plat would ensure that the recorded plat or plats would, in theory, include all changes. Holding that respondents can disregard the express requirements of one section of the deed, would also result in allowing it to ignore similar clauses in the other three sections. Such a result would be contrary to the intent of the parties to the original deed. Moreover, the creators of the tentative reservations knew exactly how to provide for several areas for a particular use, as evidenced by its tentative Beach Reservations. That is contrasted, as we have noted, to its use of singular terms in respect to *a* "Community Boat Harbor Reservation."

Respondent also argues that the lot was only to be used for private access to the water, not for building a residence, when it was sold to petitioner. If the lot were actually burdened by the "Community Boat Harbor Reservation" restriction (which

we are holding it was not), respondent would not have been in a position to sell the lot for the limited purpose of providing private access to the water. The provision expressly states that, once the lots are designated on a recorded plat, the " 'Community Boat Harbor Reservation' shall, from thenceforth be expressly and irrevocably reserved, *dedicated and restricted to use in common by the bona fide members of the Association.*" [Emphasis added]. Selling the lot for private use, even as a boat harbor, under respondent's argument that it is a community boat harbor, would be considered a breach of such a covenant if it existed as the lot would still not be available for "use in common by the bona fide members of the Association." The Association's argument is inconsistent with its claim that a community boat harbor exists. If the respondent argues that what it really meant when it conveyed the property "for private use" was that it was still subject to a public boat harbor reservation, then respondent may well have also breached the special warranty contained in the deed.

There is a great deal of emphasis placed by the respondent on notice and the State's recording statute, Maryland Code (1974, 2003 Repl.Vol.), §§ 3–101 and 3–102 of the Real Property Article ("R.P."). In respondent's view, the 1975 declaration provided constructive notice that the lots were encumbered by a restriction and was duly recorded. Respondent argues that petitioner is bound by the restricted use described in the declaration. Respondent's reliance on the recording statute and notice is misplaced. Although the declaration was recorded, the designation was created pursuant to the 1952 deed and its purpose was to exercise the rights granted by the 1952 deed; as a result, such designation had to be placed on a recorded plat in order to become effective. To give effect to the declaration without the requirement of platting, would, in fact, be contrary to the express intent of the original parties.

Finally, the property was conveyed to petitioner under a special warranty deed providing that "[respondent] does hereby covenant that he has not done nor suffered to be done any act, matter or thing whatsoever to encumber the said property hereby conveyed; that he will warrant specially the said

property hereby conveyed; and that he will execute such further assurances of the same as may be requisite." The Real Property Article provides:

"A covenant by a grantor in a deed 'that he will warrant specially the property hereby granted' has the same effect as if the grantor had covenanted that he will warrant forever and defend the property to the grantee against any lawful claim and demand of the grantor and every person claiming or to claim by, through, or under him."

R.P. § 2–106; *see also Wempe v. Schoentag*, 163 Md. 647, 163 A. 868 (1933). In *Wempe*, the Court pointed out that:

"The grantor necessarily knows whether he has ever done any act to burden the title which he is conveying, while a grantee who relies solely upon the special warranty, in the acceptance of the deed, has no such knowledge. The assurance expressed by the warranty would have its value seriously reduced, and in some cases possibly destroyed, if it were construed as leaving the title exposed to charges created by the covenanting grantor at an earlier and separate period of his ownership. No reason is apparent from the terms of the warranty why a burden imposed by the grantor upon the title at such a period should be excluded from the general category of the claims against which he has agreed that his grantees should be defended."

*Id.* at 649–50, 163 A. at 869.[5] In the case *sub judice*, respondent created the problem of which it now complains. Under the special warranty deed, however, it is precluded from attacking the title in fee simple for private use, which it conveyed to petitioner.

---

5. Under the special warranty deed, even if we were to adopt respondent's position (which we do not), it is probable that respondent would be required to defend petitioner's use of the area at issue as a private (not public) boat harbor, which is the reason why respondent now argues it sold the lot in the first place. As stated earlier, the covenant, if it had properly taken effect by the recording of a plat, would require that the designated lots be used in common by the members of the association. Petitioner's use as a private boat harbor, were the designation to be enforced, would also violate the covenant. Respondent's positions are simply inconsistent, as well as wrong.

Respondent argues that the deed also contains a clause, which states: "THIS CONVEYANCE, is also subject to the existing easements, rights of way and agreements for roadways, electric transmission lines and telephone lines and the service and maintenance thereof, as well as any covenants, restrictions or conditions of record." Because the 1975 declaration was recorded, respondent contends that petitioner was on notice and bound by the restriction created therein. This may have been true, had the 1975 declaration complied with the 1952 deed. The restrictions, however, as required by the 1952 deed, never became effective because the required plat was not filed.

## IV. Conclusion

The Circuit Court correctly determined that as a matter of law, Lot 27 was not designated as a "Community Boat Harbor Reservation." There is no dispute as to material facts which would negate a summary judgment. The intent of the parties was clearly stated in the 1952 deed. If respondent desired to create a community boat harbor it was required to designate a single "Community Boat Harbor Reservation" on a plat and record that plat reflecting that designation. As a result, the designation in the 1975 declaration, although reflecting respondent's intent to designate the three lots (comprising two different separate areas) as a single "Community Boat Harbor Reservation," fell short of the requirement set forth in the covenant of reservation.[6] There is no "Community Boat Harbor," and the Association no longer has the right or power to create one on Lot 27, Block 32. The Court of Special Appeals erred in reversing the Circuit Court's grant of summary judgment in favor of the petitioner.

---

6. As we have noted, the controlling document clearly reserved the right to create, via a plat, one boat harbor. Lots 11 and 12 in Block 24, and Lot 27 in Block 32, are not contiguous. They are clearly separate parcels and if the Court were to accept respondent's position (which it does not), the respondent would have created two boat harbors where it never had the power under the controlling document to create more than one.

642

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.